# In the United States Court of Federal Claims

No. 20-77

Filed: July 15, 2024

|  |
|---|
| **FOXWOOD, LTD.,** <br><br> *Plaintiff,* <br> v. <br><br> **THE UNITED STATES,** <br><br> *Defendant.* |

*Jeff H. Eckland*, with *Mark J. Blando* and *Lara R. Sandberg*, Of Counsel, Eckland & Blando, P.A., Minneapolis, Minnesota, for Plaintiff.

*Geoffrey M. Long*, Senior Trial Counsel, with *Tate Walker*, Of Counsel, Commercial Litigation Branch, Civil Division, *Franklin E. White, Jr.*, Assistant Director, *Patricia M. McCarthy*, Director, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General, U.S. Department of Justice, Washington, D.C., and *Zoey Kohn*, Deputy Assistant General Counsel, Office of General Counsel, U.S. Department of Agriculture, for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**[1]

There is no need to travel through windows when a doorway remains open. The United States contends that Plaintiff, Foxwood, Ltd. ("Foxwood"), upon encountering a closed door regarding prepayment of its loan, attempted to squeeze through a window by accepting a general incentive package. However, the United States' argument neglects its own inaction and apparent suspension of Foxwood's prepayment request. The record lacks a formal rejection of prepayment or specific incentive offer by the United States and, most notably, leaves the door for prepayment open. Because it chose to keep Foxwood on ice for the pendency of its decision to make an offer or consider prepayment, the statute of limitations had not begun to run as the United States suggests; its Motion to Dismiss, (Def.'s Mot. to Dism. ("Def.'s Mot."), ECF No. 32), is denied.[2]

---

[1] This case was originally assigned to Judge Patricia Campbell-Smith, (ECF No. 2), and transferred to the undersigned on November 27, 2023, (ECF No. 31).

[2] Defendant's Motion to Dismiss is accompanied by a consecutively paginated appendix, (ECF No. 32-1), which the Court cites as "Def.'s Mot. Appx. at __". Similarly, Plaintiff's Response is

I.       **Background**[3]

  *A.       FmHA Loan Programs: Enactment, Amendment, and* Franconia Associates

This litigation centers on property owners who obtained loans from the Farmers Home Administration ("FmHA") to develop affordable housing for low- and moderate-income residents.[4] (Compl. at 1, ECF No. 1). These loans were entered into under Section 515 and Section 521 of the Housing Act of 1949, Pub.L. No. 81–171, 63 Stat. 413 (codified as amended at 42 U.S.C. §§ 1485, 1490a (2000)) (collectively referred to as "FmHA loans"), obligating borrowers to operate the properties according to FmHA regulations in exchange for favorable loan terms.

Overall, these FmHA loans have significantly ensured access to affordable housing for rural residents across the United States for more than fifty years. Richard Michael Price & Rebecca Simon, *Preservation Issues and Strategies for USDA's Rural Housing Service Multifamily Direct Loan Portfolio*, J. Affordable Housing & Community Dev. L., at 47 (2021). In 1966, the program expanded to serve all low- and moderate-income families in rural communities. Pub.L. No. 89–754, § 804, 80 Stat. 1255, 1282 (1966). By the early 1970s, Section 521, a rental assistance program, was introduced to generally expand the availability of loans and allow some Section 515 tenants to qualify for rent subsidies. *See* Pub.L. No. 90–448, § 1001, 82 Stat. 476, 551 (1968) (codified as amended at 42 U.S.C. § 1490a). In connection with the FmHA loan programs, each borrower, including Foxwood, would execute a loan agreement, mortgage, and promissory note. 42 U.S.C. § 1490a; (*see* Def.'s Mot. Appx at 1–12 (loan agreement, promissory note, and mortgage for the FmHA loan to Foxwood)).

Today, FmHA loans remain a crucial source of affordable housing in rural areas. These loan agreements facilitate the construction of "decent, safe, and sanitary" rental dwellings. *See*

---

accompanied by a consecutively paginated appendix, (ECF No. 34-1), which the Court cites as "Pl.'s Resp. Appx. at __".

[3] Unless specifically controverted, the Court assumes the truth of Foxwood's factual allegations only for the purposes of this motion. However, "[t]he Court may consider materials extrinsic to the pleadings to determine the existence of subject-matter jurisdiction." *Comprehensive Cmty. Health & Psychol. Servs., LLC v. United States*, 120 Fed. Cl. 447, 451 (2015) (citing *Cedars-Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1584 (Fed. Cir. 1993)). The facts herein are illustrative rather than conclusory findings.

[4] Pursuant to the Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994, Pub. L. No. 103-354, § 233, 108 Stat. 3178 (1994), the Secretary of the Department of Agriculture was authorized to establish a successor agency to Farmers Home Administration known as Rural Housing and Community Development Services ("RHCDS"), which was later titled Rural Housing Service ("RHS"). Agency Name Change, 61 Fed. Reg. 2899 (1996). RHS operates within the Department of Agriculture known as "Rural Development." The Court broadly uses the terms "FmHA" or "Agency" to reference Farmers Home Administration or its successor agencies.

42 U.S.C. §§ 1485(a), (m)(1). However, the path to good intentions in government programs is often obscured by sludge. *See generally Franconia Assocs. v. United States,* 536 U.S. 129 (2002); *see also* Cass R. Sunstein, *Sludge: What Stops Us from Getting Things Done and What to Do About It* (2021) (broadly defining bureaucratic "sludge" as the unnecessary friction and hurdles that prevent people from getting things done).

Behind the scenes, Congress noticed a trend: borrowers with FmHA loans were increasingly choosing to prepay their loans, an option that gave borrowers a chance to conclude their participation in the loan program early. *See Franconia Assocs.,* 536 U.S. at 135. Congress concluded this could eventually jeopardize the continued availability of affordable housing options. *Id.*; *see also* H.R. Rep. No. 96–154, slip op. at 43 (1979). Eliminating the prepayment right for FmHA loans was not a single, definitive action, but rather a legislative dance. After many efforts, Congress eventually implemented the Emergency Low Income Housing Preservation Act of 1987 to address the issue of prepayment and ensure the continued availability of affordable housing. L. No. 100-242, 101 Stat. 1877 (1988) ("ELIPHA"); Housing and Community Development Act of 1992, Pub. L. No. 102-550, 106 Stat. 2672 (1992) ("HCDA"). These laws retroactively limited a borrower's rights to prepay its loans. In place of the prior unfettered right to prepay, Congress and the U.S. Department of Agriculture ("USDA") created a regulatory process whereby the FmHA would evaluate whether the borrower should be permitted to prepay.

ELIHPA provides that, before FmHA may accept the prepayment of a Section 515 loan, it shall "make reasonable efforts to enter into an agreement . . . under which the borrower will make a binding commitment to extend the low-income use of the assisted housing and related facilities involved for not less than the 20–year period beginning on the date on which the agreement is executed." *Franconia Assocs.,* 536 U.S. at 136 (citing 42 U.S.C. § 1472(c)(4)(A) (1994 ed.)). ELIPHA recognized the contractual right of post-1979 FmHA loan holders to terminate their contracts by prepaying their loans at any time, provided that all conditions were met. The HCDA restricted prepayment rights for loans, such as Foxwood's, made from December 21, 1979, through 1989. HCDA § 712, 106 Stat. 3841 (codified at 42 U.S.C. § 1472(c)). The HCDA permanently applied ELIHPA's restrictions to all FmHA contracts entered into before 1989. *See id.* The statute made no exception for contracts effectuated before 1979, nor did it single out (as ELIHPA had done for pre-1979 contracts) any special treatment for those contracts entered into between 1979 and 1989. *See id.*

The USDA's Rural Housing Service ("RHS"), the successor to the FmHA, administers FmHA loans through the USDA Rural Development ("RD"). Upon a borrower's request to prepay, the RHS may offer financial incentives in exchange for extending the property's low-income use. 42 U.S.C. § 1472(c)(4). These incentives can include equity loans. *Id.* §§ 1472(c)(4)(B)(i–vi). The Secretary can approve such incentives if deemed necessary for a fair return on the borrower's investment and the most cost-effective option for the government, consistent with program goals. *Id.* §§ 1472(c)(4)(C)(i–ii)). If the borrower declines the incentives, they must first offer the property for sale to a qualified non-profit or public agency at fair market value, determined by mutually chosen appraisers. *Id.* § 1472(c)(5)(A)(i). After a 180-day marketing period with no qualified buyer, the RHS may then accept the borrower's prepayment offer. *Id.* § 1472(c)(5)(A)(ii); *see also* 7 C.F.R. § 3560.653 ("Borrowers seeking to prepay an Agency loan must submit a written prepayment request to the Agency at least 180

3

days in advance of the anticipated prepayment date and must obtain Agency approval before the Agency will accept prepayment."). With certain limited exceptions, if FmHA and the borrower cannot reach an agreement, "after a reasonable period . . . [FmHA] shall require the borrower . . . to offer to sell the assisted housing and related facilities involved to any qualified nonprofit organization or public agency at a fair market value[.]" 42 U.S.C. § 1472(c)(5)(A)(i).

Borrowers, concerned with the effects these legislative acts had on their loan agreements, challenged the constitutionality of the ELIHPA in *Franconia Associates v. United States*. Before the Court of Federal Claims, the United States moved to dismiss the claims of pre-1979 borrowers on statute of limitations grounds, and the trial court agreed, holding that their claims accrued in 1987 when Congress enacted ELIHPA and restricted their ability to prepay their loans. *Franconia Assocs. v. United States*, 43 Fed. Cl. 702, 715 (1999); *see also Grass Valley Terrace v. United States*, 46 Fed. Cl. 629, 635 (2000). The Federal Circuit affirmed this holding. *Franconia Assocs. v. United States*, 240 F.3d 1358 (Fed. Cir. 2001); *Grass Valley Terrace v. United States*, 7 Fed. Appx. 928, 2001 WL 534141 (Fed. Cir. 2001) (per curiam). The Supreme Court, however, reversed those findings. *Franconia Assocs.*, 536 U.S. 129.

The dispute in *Franconia* revolved around the appropriate classification of the United States' action and the statute of limitations for filing suit. *See infra.* 536 U.S. at 139. While the government argued the limitations period began upon ELIHPA's enactment, Franconia Associates (and other similarly situated plaintiffs) contended the clock started when the government refused a prepayment attempt. *Id.* The Supreme Court ultimately held that Plaintiffs' claims did not accrue when Congress enacted the statute, but rather, the legislation amounted to an anticipatory repudiation. *Id.* at 148. It explained that an anticipatory repudiation is not an immediate breach, but rather ripens into a breach only when performance becomes due or when the promisee elects to treat the repudiation as a breach. *Id.* at 143–44. The Supreme Court clarified that a "breach would occur, and the six-year limitations period would commence to run, when a borrower tenders prepayment and the government then dishonors its obligation to accept the tender and release its control over use of the property that secured the loan." *Id.* at 148.

Following *Franconia*, the Court witnessed a substantial increase in the number of filings from similarly situated parties. These claims now constitute a significant portion of the Court's docket and are frequently resolved through settlement agreements, thereby avoiding full litigation. However, when litigation does proceed, the central legal issue is often the statute of limitations.

   B.  *Foxwood's Loan and Initial Request for Prepayment*

On March 31, 1986, Foxwood entered into an FmHA loan agreement according to the process described above. (Def.'s Mot. Appx. at 1). This agreement stipulated a loan term extending over fifty years. (*Id.*). In addition to the loan agreement, Foxwood executed both a promissory note and mortgage. (*Id.* at 4–6, 7–12). The promissory note granted Foxwood the

4

option to prepay scheduled installments at *any* time provided the loan remained current. (*Id.* at 5). Specifically, the promissory note provided that "[p]repayments of scheduled installments, or any portion thereof, may be made at any time at the option of the Borrower." (Compl. at 5). Conversely, the mortgage included an addendum requiring Foxwood to maintain the housing exclusively for eligible tenants for twenty years, until March 31, 2006. (Def.'s Mot. Appx. at 11). Subsequently, Foxwood proceeded with the construction of Foxwood Apartments, a thirty-two-unit property situated in Eustis, Florida, in compliance with FmHA loan program specifications. (Compl. at 3, 12).



Affordable Housing Online, Foxwood Apartments, 2510 East Washington Ave, Eustis, FL 32726, https://affordablehousingonline.com/housing-search/Florida/Eustis/Foxwood-Apartments/10104072 (last visited June 12, 2024).

After facing economic hardship in the early-2000s, Foxwood required rental assistance ("RA"). (Pl.'s Resp. Appx. at 2). To combat this, the Agency directed Foxwood to submit what is known as a "Servicing Workout Plan" ("SWOP") to address Foxwood's financial issues. (*Id.* at 2); 36 No. CD-7 HDR Current Developments 30 ("In a rent incentive [Servicing Workout Plan], funds that would otherwise constitute the return to the owner[ ] will be paid to the project to cover the difference between the basic rent and the lower rent incentive rent."). If a borrower does not obtain Agency approval for its SWOP, it risks a variety of Agency enforcement actions. 7 C.F.R. §§ 3560.452(a), 3560.456(b), (d) ("The [Agency] will not pursue enforcement against a borrower in default (monetary or nonmonetary) if an approved work-out agreement is in place and on schedule."). The Agency denied Foxwood's initial request for "servicing" RA and recommended an "incentive" RA—something that necessitated a prepayment request. (Pl.'s Resp. Appx. at 3). After two years of discussion and strategizing an approach to apply for and receive RA, Foxwood submitted a "request for prepayment" of its FmHA loan in full by January 1, 2013, simultaneously certifying its ability to prepay.[5] (Def.'s Mot. Appx. at 13, 16).

---

[5] Plaintiff details a complex fact pattern on this process and includes several exhibits and declarations to evince its argument. (Pl.'s Resp. at 6–14). The Court does not recite those allegations herein given the nascent stage of litigation and the relevance to the conclusion and findings below. Further, the Court notes that, in determining whether a breach occurred or a contract condition is triggered, subjective intent is not typically relevant. *See Tamerlane, Ltd. v. United States*, 550 F.3d 1135, 1144 n.15 ("As with general contract principles, the subjective intent of the parties is immaterial to whether a contract has been breached."); *Navair, Inc. v. IFR Ams., Inc.*, 519 F.3d 1131, 1138–39 (10th Cir. 2008); *In re Johns–Manville Corp.*, 440 B.R. 604, 614 (Bankr. S.D.N.Y. 2010) (subjective intent irrelevant in determining whether contract condition triggered).

5

The USDA responded on August 14, 2012 with a "General Incentive Offer." (Def.'s Mot. Appx. at 28). This offer outlined the USDA's willingness to develop a "Specific Incentive Offer" containing various potential incentives it may offer, such as equity loans or additional rental assistance, should Foxwood choose to proceed. (*Id.* at 28–29). The offer further advised Foxwood that rejecting the general incentive would lead to notification of "additional processing requirements, including the possibility of prepaying the loan, or offering the project for sale to a non-profit organization." (*Id.* at 29). Foxwood had thirty days to accept the general offer. (*Id.* at 28). Foxwood confirmed its general acceptance on September 13, 2012, expressing the understanding that a specific offer would follow. (*Id.* at 30).

On December 17, 2012, an RD area director informed Foxwood that the agency was undergoing a policy reevaluation regarding prepayment incentive offers for FmHA loans. (*Id.* at 31). The letter states:

> Rural Development is currently reevaluating its policy and procedure for offering and funding Multi-Family Housing Section 515 direct loan prepayment incentive offers. Therefore, our Agency is not allowed to make any prepayment incentive offers on Section 515 Properties until further issuance from the National Office has been received.
>
> Your application has been accepted and is complete, and will have priority based on the application date when incentives are able to be offered. We have not been given a timeframe for when changes to the prepayment process will be made. We will retain your application and notify you when we have news, and will be able to continue processing the application.

(*Id.*).

C.   *Foxwood's Application Withdrawal and Second Request to Prepay*

Time passed. Nearly three years later, on April 13, 2015, the USDA contacted Foxwood again. The communication outlined new agency procedures for processing incentive applications and requested additional information from Foxwood to determine their eligibility for certain incentives. (Def.'s Mot. Appx. at 32–33). On December 3, 2015, the USDA informed Foxwood that their request for RA would be denied. (*Id.* at 34). In light of this development, the USDA requested that Foxwood "withdraw its prepayment application." (*Id.* at 34 (e-mail from USDA to Foxwood)). Foxwood responded on December 7, 2015, formally withdrawing its prepayment request due to the unavailability of near-term rental assistance. (*Id.* at 35 (letter withdrawing application)). Foxwood's withdrawal letter notes that its prepayment application was "predicated upon the potential receipt of servicing [RA]," and that the application was being withdrawn because "there was no imminent incentive of [RA] available now or in the foreseeable future." (*Id.*).

After the decision to sell the property in 2018, Foxwood sought to prepay its loan and exit the program. (Pl.'s Resp. Appx at 15). As part of this process, Foxwood submitted a formal request to prepay its loan to the United States on July 31, 2018. (*Id.* at 110 (declaration)). This proceeded to standard settlement negotiations, with Foxwood submitting a damage model and

6

supporting documentation on October 22, 2018. (*Id.*). The United States responded on December 12, 2018, raising issues related to the damage model but not mentioning any prior prepayment request. (*Id.*). However, on May 9, 2019, the United States introduced Foxwood's 2012 prepayment documents and shared its position that its claim was no longer viable. (*Id.* at 111). This development hindered further settlement discussions, leading Foxwood to file this lawsuit on January 23, 2020. (*Id.*; *see generally* Compl.).

## II.     Analysis

Title 28, U.S.C. § 2501 establishes a jurisdictional bar in this Court for claims brought outside the six-year statute of limitations. After over three years of "structured settlement discussions," and nearly four years from sharing its position with Foxwood, the United States' position remains that Foxwood's claims are "untimely pursuant to 28 U.S.C. § 2501, and this Court lacks subject matter jurisdiction over the case." (Nov. 20, 2023 JSR, ECF No. 29). This is based on the belief that Foxwood's claims are beyond six years from January 1, 2013, "which was the date on which Foxwood attempted to prepay its loan, and was rebuffed." (Def.'s Mot. at 2). Thus, the United States believes that the statute of limitations expired on January 1, 2019 at the latest, making Foxwood's claims one year and twenty-two days late. (*Id*. at 20).

For its part, Foxwood contends that the United States' motion to dismiss is premature. (Pl.'s Resp. at 1). It believes that the July 10, 2012 letter establishing a prepayment date of January 1, 2013 presents a limited view of the relevant evidence concerning the parties' prepayment intentions. (*Id.*). Foxwood maintains that discovery will demonstrate that neither party objectively contemplated an immediate prepayment on January 1, 2013, but was instead a cog in the machine that would facilitate discussions regarding RA within the FmHA loan program. (*Id.*). In making such an argument, Foxwood first argues that its "prepayment application" lacked the necessary elements required to contract, (*id.* 17–24), and goes on to paint a rather unsettling picture of what it classifies as being "induced" and "coerced" into applying for pre-payment, (*id.* at 6–14, 26–35).[6] Notably, Foxwood also argues that the United States' "repudiation did not ripen into a breach because no cognizable rejection exists." (*Id. at* 24–26).

---

[6] In the context of motions to dismiss, considerations involving state of mind, intention, coercion, duress, and similar factors are generally deemed inappropriate. *See Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1201 (10th Cir. 2003) (quoting *Yoder v. Honeywell, Inc.,* 104 F.3d 1215, 1224 (10th Cir. 1997)). This is primarily because such issues typically necessitate factual findings that cannot be conclusively determined solely through examination of a paper record. *See Lowery v. United States*, 167 Fed. Cl. 28, 37 (2023) (citing *United States v. Certain Real & Pers. Prop. Belonging to Hayes*, 943 F.2d 1292 (11th Cir. 1991)) (finding that it is within the Court's purview to deny dispositive motions when it believes the case will benefit from a full hearing). For purposes of establishing jurisdiction, "[s]ubstance, not form, is controlling." *Williams v. Sec'y of the Navy*, 787 F.2d 552, 557 (Fed. Cir. 1986). "[I]f the facts reveal any reasonable basis upon which the non-movant may prevail, dismissal is inappropriate." *Airport Road Assocs., Ltd. v. United States*, 866 F.3d 1346, 1351 (Fed. Cir. 2017) (quoting *Pixton v. B & B Plastics, Inc.*, 291 F.3d 1324, 1326 (Fed. Cir. 2002)). Thus, even if the United States' Motion were not denied on grounds of failing to reject Foxwood's payment, the Court could not make findings for or against Foxwood at this stage of litigation as to its other arguments.

7

The Court agrees with Foxwood that the United States' actions (and inaction) preclude the statute of limitations from ticking. Thus, based on the record before it, Foxwood's claims remain timely and the Court possesses subject-matter jurisdiction.

### A.     Standards

Under RCFC 12(b)(1), the burden of establishing subject matter jurisdiction rests with the plaintiff, who must do so by a preponderance of the evidence. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). This Court's jurisdiction to entertain claims and grant relief depends on the extent to which the United States has waived sovereign immunity. *United States v. Testan*, 424 U.S. 392, 399 (1976). When faced with a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), the Court must assume that all undisputed facts alleged in the complaint are true and draw all reasonable inferences in the plaintiff's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *see also Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). Moreover, the Court may look to evidence outside of the pleadings to ascertain the propriety of its exercise of jurisdiction over a case. *Rocovich v. United States*, 933 F.2d 991, 994 (Fed. Cir. 1991), *aff'd in relevant part*, *Martinez v. United States*, 281 F.3d 1376 (Fed. Cir. 2002).

A plaintiff has six years to file a claim over which the Court of Federal Claims has jurisdiction, or else the claim is barred by the statute of limitations. 28 U.S.C. § 2501 ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."); *see also San Carlos Apache Tribe v. United States*, 639 F.3d 1346, 1349–50 (Fed. Cir. 2011). This statute of limitations serves as "an express limitation on the Tucker Act's waiver of sovereign immunity," *Hart v. United States*, 910 F.2d 815, 817 (Fed. Cir. 1990) (citing *Soriano v. United States*, 352 U.S. 270, 273–74, (1957)); thus, it serves as an absolute "jurisdictional" bar to claims that are filed outside of this six-year period. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134 (2008), *aff'g*, 457 F.3d 1345 (Fed. Cir. 2006). Should the Court determine that "it lacks jurisdiction over the subject matter, it must dismiss the claim." *Matthews v. United States*, 72 Fed. Cl. 274, 278 (2006).

Both physical takings and breach of contract claims accrue when the scope of what is taken is fixed and the plaintiff knew or should have known of the acts that fixed the government's alleged liability. *Katzin v. United States*, 908 F.3d 1350, 1358 (Fed. Cir. 2018) (takings); *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988) (contracts). Stated differently, accrual begins "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *FloorPro, Inc. v. United States*, 680 F.3d 1377, 1380 (Fed. Cir. 2012).

### B.     *The United States' conduct cannot be considered a rejection triggering the statute of limitations for Foxwood's breach of contract claim.*

The core dispute here centers on the precise moment a breach of contract occurs in this specific context. The Supreme Court in *Franconia Associates v. United States* reveals a nuanced approach that balances contractual obligations with broader public policy considerations. In *Franconia*, the Supreme Court held that "ELIHPA effected a repudiation of the FmHA loan

8

contracts, not an immediate breach." 536 U.S. at 143. The Supreme Court's decision expressly distinguished between repudiation and breach in *Franconia* by drawing the line at "the time for performance"—until the government's obligation to "allow" or "accept" prepayment comes "due," it has at most repudiated its obligation to accept prepayment. 536 U.S. at 139, 148 (followed by *Airport Rd. Assocs., Ltd. v. United States*, 866 F.3d 1346, 1352 (Fed. Cir. 2017)). In coming to this decision, *Franconia* reiterates basic contract principles—that a "promisor's renunciation of a 'contractual duty before the time fixed in the contract for . . . performance' is a repudiation," whereas a "[f]ailure by the promisor to perform at the time indicated for performance in the contract establishes an immediate breach." *Id.* at 142–43 (quoting 4 A. Corbin, Contracts § 959, p. 855 (1951)) (citing Restatement (Second) of Contracts §§ 235(2), 250 (1979)). However, no further case law has established "what other government actions or non-actions would constitute non-acceptance of a prepayment request." *Airport Rd. Assocs., Ltd.*, 866 F.3d at 1354 n.7.

ELIHPA's implementing regulations establish a process by which the FmHA addresses prepayment requests. Under those procedures, before accepting any offer to prepay or refinance, the "Secretary shall make reasonable efforts to enter into an [incentive] agreement with the borrower." 42 U.S.C. § 1472(c)(4)(B). Only if the borrower rejects that offer will the Secretary attempt to make the determinations—regarding the effect on minority housing opportunities, the displacement of tenants, and the supply of affordable housing in the market—required by 42 U.S.C. § 1472(c)(5)(G) before prepayment can be accepted. Here, while the surrounding facts and circumstances are disputed, the parties agree that Foxwood submitted a prepayment application on July 10, 2012 resulting in the general incentive offer letter. (Def.'s Mot. Appx. at 13). This sort of letter is not novel.



Florida/Virgin Islands
2441 NE 3rd Street
Suite 204-1
Ocala, FL  34470

OCALA AREA OFFICE
Telephone: (352) 732-7534
FAX: (352) 732-9728
TDD: (352) 338-3499
www.rurdev.usda.gov/fl

August 14, 2012

Ms. Pam Borton
FOXWOOD, LTD.
P. O. Box 10293
Clearwater, FL  33757

RE: Foxwood, Ltd. – General Incentive Offer

Dear Ms. Borton:

This letter is to notify you that in response to your request to prepay your multi-family housing loan, USDA, Rural Development is prepared to develop an incentive offer that would include one or more of the incentives found in HB-3-3560.655.

These include the following:

    a. An equity loan
    b. Additional rental assistance
    c. Increased annual return on investment
    d. Excess Section 8 rents
    e. Conversion or modification of interest credit.

> If you accept a "Specific" incentive package, you will be required to execute a "Restrictive Use Agreement" that will obligate you and any successors in title to restricting the use of the above-referenced housing project to very-low, low, and moderate income tenants for a period of 20 years from the date the incentives are closed. An incentive package is a one-time offer.
>
> This letter serves as a "General Incentive Offer." If you accept this general offer, a "Specific Incentive Offer" will be developed for you. You have until September 14, 2012 to accept or reject this "General Incentive Offer" in writing. If you do not respond in writing, either by accepting or rejecting these incentives, we will consider your request for prepayment concluded and the incentive offer will be considered withdrawn without additional notification.
>
> If you reject the "General Incentive Offer," Rural Development will advise you of additional processing requirements, including the possibility of prepaying the loan, or offering the project for sale to a non-profit organization. Your response must be postmarked no later than September 14, 2012.
>
> Please consider these incentives carefully, and if you have any questions, call this office at 352-732-7534.
>
> Sincerely,
>
> R. C. QUAINTON, II
> Area Director IV
>
> cc:  SO - MFH

(Def.'s Mot. Appx. at 28).

The United States largely relies on *Tamerlane, Ltd. v. United States*, 550 F.3d 1135 (Fed. Cir. 2008), where the Federal Circuit sought to "define the contours of the tender and rejection that are sufficient to trigger" the running of the statute of limitations regarding an ELIPHA claim. *Tamerlane* held that "[t]he *Franconia* decision requires no more formalism than the written request to prepay followed by non-acceptance of the request by the government to trigger the running [of] the statute of limitations." *Id.* at 1143. However, the Court further stated that "other conduct" by the government, aside from refusing to accept a prepayment request, "could constitute breach[.]" *Id.* In that case, the United States' offer of a specific incentive qualified as an affirmative rejection of tender.

> The government's responses to [plaintiffs] did not explicitly state that the offers of prepayment were "rejected."[FN] However, the government did not accept those offers. In other words, by offering incentive loans in response to [plaintiffs] requests for prepayment, the government necessarily rejected the tender and breached its obligation to accept prepayment at any time. This conclusion is reinforced . . . given that the government's offer of incentives was preceded by a letter in which the government expressly declined to accept prepayment.

*Id.* at 1143.

10

In *Tamerlane*, though, the plaintiffs received an "offer letter" different from the one Foxwood received. There, the gist was that "FmHA *is offering* a package of one-time incentives so that [they] may remain in the FmHA multiple family housing loan program in order to extend the low-income use of the housing[,]" under the condition that further contract terms would be imposed. *Id.* n.14 (emphasis added). Notably, these were followed by rejection letters. Later, in *Airport Road Associates, Ltd. v. United States*, 866 F.3d 1346 (Fed. Cir. 2017), which the United States also relies on, the Circuit clarified its position: "[W]e disagree with the government's position that any response other than outright acceptance . . . qualifies as conduct constituting breach. Such a requirement reads our 'unfettered right' language in *Tamerlane* too rigidly." 866 F.3d at 1353. There, the Circuit found that merely informing a borrower of procedural steps did not qualify as a rejection for purposes of the statute of limitations. *Id.*

The Agency's communication to Foxwood was not a "one-time offer." In fact, pursuant to the December 2012 letter, "prepayment incentive offers" were prohibited. (Def.'s Mot. Appx. at 31). The general incentive offer can best be described as an offer of a second, attenuated one-time offer, with the potential to prepay left open. (*See id.*). If *Airport Road* and *Tamerlane* constitute the ends of a spectrum, Foxwood's case falls somewhere in the middle. However, finding that this case more closely resembles *Airport Road* rather than *Tamerlane*, the Court finds that the United States' conduct here does not qualify as a rejection. It is not akin to *Tamerlane*'s offer of a specific incentive. Simply put, an expression of willingness to make an offer is not the same as a firm offer without more detail. Restatement (Second) of Contracts § 2 cmt. f ("A promise must be distinguished from a statement of opinion or a mere prediction of future events."); *Ingham Reg'l Med. Ctr. v. United States,* 126 Fed. Cl. 1, 23 (2016), *aff'd in part, rev'd in part on other grounds*, 874 F.3d 1341 (Fed. Cir. 2017) ("Expression[s] of intention or general willingness to do something on the happening of a particular event or in return for something to be received do[ ] not amount to an offer[.]"); *Bogley's Estate v. United States*, 514 F.2d 1027, 1032–33 (Ct. Cl. 1975).

Vital to this finding are: (1) the "general" nature of the incentive offer; (2) the language indicating that the "possibility of prepaying" remains open; (3) adding additional steps to pursue the application to prepay; (4) the fact that *no* specific incentive offer was made despite keeping Foxwood on the back burner for a potential offer for *years*; (5) the indication that the parties considered Foxwood's prepayment application as "pending" until its withdrawal after learning that no specific incentive offer could be made; and (6) that Foxwood could reject the *specific* incentive offer, which would lead to processing its prepayment application. This conclusion is reinforced given that the general offer of incentives was *not* preceded by a letter in which the government expressly declined to accept prepayment.

In *Saline Associates No.1 Ltd. Partnership v. United States*, the Court held that, to bring suit, plaintiffs are limited to two options: they could file suit immediately or attempt to exercise their prepayment right and file suit when the Government refuses to accept prepayment. 129 Fed. Cl. 737, 741 (2016), *aff'd*, 766 F. App'x 962 (Fed. Cir. 2019). In this case, Foxwood is in the position that its request was held in limbo, with additional steps to take for eligibility for a specific incentive offer and additional steps for consideration of its prepayment application. (*See* Def.'s Mot. at 20 ("USDA indefinitely froze Foxwood's prepayment application[.]"); Def.'s Mot. Appx. at 33).

11

As a general principle of contracts, the Federal Circuit states that a breach of contract claim arises when "a plaintiff has done all he must do to establish his entitlement to [performance] and the defendant does not [perform][.]" *Brighton Vill. Assocs. v. United States*, 52 F.3d 1056, 1060 (Fed. Cir. 1995). *Franconia* is nuanced in that it balances the borrower's right to prepay with the government's ability to manage its programs effectively, ensuring a balance between contractual obligations and broader public policy considerations. *See generally* 536 U.S. 129. However, recognizing the nuances and exceptions remains crucial when analyzing specific situations. Subsequent cases have consistently applied and reinforced the general principle of *Franconia* in more novel situations. *Franconia* and its progeny rest on a clear distinction between repudiation and breach by drawing the line at the time for performance—until the government's obligation to allow or accept prepayment comes due, it has at most repudiated its obligation to accept prepayment. *See Airport Rd.* at 1352.

In *Grass Valley Terrace v. United States*, a case consolidated for purposes of the Supreme Court's *Franconia* ruling, the FmHA's request for additional steps before processing the prepayment request was not considered a breach. 69 Fed. Cl. 341 (2005). The Court found that "[a]bsent from the letter is any rejection or denial of the prepayment request. In fact, and to the contrary, the FmHA, through the letter, seems to acknowledge that Plaintiff will be able to prepay, but that it must first complete certain "items[.]"" *Id* at 354–55. The Court's determination was ultimately because the United States had "not set forth any evidence demonstrating that the government materially impaired Plaintiff's prepayment rights[.]" *Id*. Similarly, in *Kasarsky v. Merit Systems Protection Board*, the Federal Circuit applying *Franconia* held that an agency's silence and delay was insufficient to trigger the statute of limitations because "a breach did not occur until [plaintiff] was aware of the agency's refusal to pay." 296 F.3d 1331, 1338 (Fed. Cir. 2002). Thus, it stands to reason that the United States' actions here were also insufficient to trigger rejection.

As to this state of limbo, the United States hangs its hat on the words "accepted" and "complete" in the letter from the RD. (Def.'s Mot. Appx. at 31). However, this is merely a reference to Foxwood's application; it is not a reference to where it is in being processed. (*See id.*). In fact, after stating that there was no concrete timeline for processing prepayment applications, the letter states that "[w]e will retain your application and notify you when we have news, and will be able to *continue processing* the application." (*Id.* (emphasis added)). The Agency's communication did not provide any assurances to Foxwood beyond acknowledging that its application had not yet been processed. Notably, while not determinative of the issue, the Agency itself did not consider the application to be processed. (*Id.* at 34 (Dec. 2015 email from USDA: "We have been told we need to clean up our prepayment applications, which means we cannot leave applications such as Foxwood pending. It must either move forward or be withdrawn. We have not seen any indication that the National Office is able to approve any incentive that needs rental assistance.")).

Regardless of the Court's level of certainty, adopting the United States' position presents substantial logistical difficulties. First, the Court's finding preserves contractual certainty by defining the breach point as the government's more active (but not formal) rejection of the prepayment offer and not when a hold or freeze is placed on an application. This clarity allows both parties to understand their rights and obligations, minimizing confusion and potential litigation. Second, finding that a proposal of an attenuated offer is "good enough" to satisfy a

12

breach may open the United States up to liability for *not offering* a specific incentive package before the proposed date of prepayment. This would ignore the realities of government bureaucracies, which often require time to process requests, including prepayment offers, as well as benefit shortages. The Court's finding here allows the government a reasonable timeframe to fulfill its administrative duties without automatically triggering a breach. Finally, the Court's finding accommodates public policy objectives. Government-backed loan programs are often established with specific social or economic goals in mind, like promoting affordable housing or supporting rural development. This ruling allows the government some leeway to explore alternatives to prepayment, such as offering incentives that align with program goals, without immediately breaching a contract.

The United States' actions did not constitute a rejection of Foxwood's application in light of the following: (1) the general nature of the incentive offer, (2) the continued possibility of prepayment, (3) additional application steps, (4) the lack of a specific offer despite extended consideration, (5) the pending status of the application until its ultimate withdrawal, and (6) Foxwood's right to reject any specific offer. Given this finding, it is unnecessary to address Foxwood's remaining arguments.

        C.      *Foxwood's takings claim accrues with its breach of contract claim.*

As a general matter, "the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim." *Sun Oil Co. v. United States*, 572 F.2d 786, 818 (Ct. Cl. 1978) (citations omitted). Thus "[t]aking claims rarely arise under government contracts" when the government is acting in "its commercial . . . rather than in its sovereign capacity[.]" *Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001). *Franconia* does not provide guidance as to when the statute of limitations begins to run on takings claims brought by an FmHA loan borrower. *See* 536 U.S. at 149 ("The Federal Circuit's holding that takings relief was time-barred hinged entirely upon passage of ELIHPA. Because that conclusion was incorrect, we hold, the Federal Circuit erred in dismissing petitioners' takings theory on grounds of untimeliness."). However, the United States believes that "Foxwood's takings claim carries the same accrual date as its breach of contract claim." (Def.'s Reply at 3, ECF No. 40).

The Court agrees that if Foxwood's claim for breach of contract is timely, its takings claim must also be timely. Authority states that when a party believes the government has interfered with its property rights in the context of a government contract, it must seek recourse for the alleged wrong "in contract rather than under a takings claim." *Piszel v. United States*, 833 F.3d 1366, 1376 (Fed. Cir. 2016). This is because "plaintiffs' contract rights cannot be greater in a takings analysis than in a contract analysis. If they do not have a contract right, there is no property to be taken. Vice versa, if they have a contract right, their remedy is to assert that right." *Saline Assocs. No.1 Ltd. P'ship*, 129 Fed. Cl. at 742. Because the statute of limitations has not expired on Foxwood's breach of contract claim, the same applies to its takings claim.

13

### III. Conclusion

Based on the foregoing analysis, the Court finds that Foxwood's claims fall within the statute of limitations. Thus, the United States' Motion to Dismiss, (ECF No. 32), is **DENIED**. Further, the Court adopts the following schedule:

| Event | Deadline |
|---|---|
| United States' Answer | August 13, 2024 |
| Joint Preliminary Status Report | September 10, 2024 |
| Close of discovery | November 8, 2024 |
| Joint Status Report | November 12, 2024 |
| Status Conference | November 14, 2024, 1:00 p.m. ET<br>In Chambers (Telephonic) |

**IT IS SO ORDERED.**



s/     David A. Tapp
DAVID A. TAPP, Judge